Filed 6/9/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HUNG TRAN,<br><br>    Defendant and Appellant. | D075280<br><br><br>(Super. Ct. No. SCD270648 ) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch, Judge.  Affirmed.

Spolin Law and Aaron Spolin, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Hung Tran of assault by means likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1) and mayhem (§ 203; count 2).  In regard

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III, IV.

to count 1, the jury found true that Tran personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (b)).

The court sentenced Tran to prison for four years. In doing so, the court struck the great bodily injury allegation and stayed the sentence under count 2.

Tran appeals, contending the court erroneously admitted into evidence "doctored" videos used by the prosecution's expert witness during his testimony; substantial evidence does not support his conviction under counts 1 and 2; the court erroneously admitted lay opinion testimony from a prosecution witness; and Tran's trial counsel was prejudicially ineffective. We determine that none of Tran's claims has merit and affirm.

FACTUAL BACKGROUND

In the summer of 2016, M.C., his cousin, and his friends were experiencing the nightlife in San Diego's Gaslamp Quarters. Around 1:30 a.m. on Saturday, August 27, 2016, M.C. and his friend A.N. left Fluxx Nightclub and walked to The New Yorker to grab a slice of pizza. The Gaslamp district was crowded at the time because the bars were about to close at 2:00 a.m.

Around the same time, two groups of people had been quarreling inside the Gaslamp Café, which prompted D.M., one of the establishment's bartenders and servers, to ask them to leave. The two groups exited the restaurant. One of the two groups consisted of Tran, his girlfriend K.B., his brothers T.T. and D.T., his cousin D.X., and

_____

1  Statutory references are to the Penal Code unless otherwise noted.

2

three friends:  D.M., K.N., and S.P., who were all in San Diego to celebrate T.T.'s birthday.  Multiple witnesses described Tran's group as being of Asian ancestry.[2]

On the other side of the dispute were two unidentified African American men, although one eyewitness identified them as "a few Hispanics" and another recalled them being of Asian ancestry as well.  None of the individuals involved in the argument were known to be affiliated with any gang.

Around 2:00 a.m., shortly after leaving the Gaslamp Café, the two groups remained agitated and congregated in the patio area outside the café where they continued to yell at each other.  While eating their pizza, M.C. and A.N. heard "a lot of yelling" from the argument outside the nearby Gaslamp Café, as the two groups splintered into multiple groups of people arguing, escalating the intensity, and eventually leading to physical altercations.

As dozens of people surrounded or became ensnared in the rapidly escalating confrontation, bystander D.M. tried to intervene, but without success.  Also trying to defuse the situation, M.C. and A.N. walked toward the center of the conflict and attempted to break up the fight and prevent further escalation.  They both inserted themselves in between combatants and tried to push them away from each other.  A.N. recalled lifting his hands and pushing on the chests of the men engaged in fisticuffs.

As chaos ensued, the two African American men walked away from the altercation, but multiple members of Tran's group instead shifted their aggression toward

---

[2]     One eyewitness described the men punching the victim as "Hispanic."

M.C. and A.N. One of the women in Tran's group told A.N. not to intervene. Moments later, Tran's brother T.T. moved toward A.N. to ask him, "What's up? What's up?" A.N. tried to ease the tension, responding, "the cops are coming, and I know nobody wants to go to jail." But T.T. responded, "Oh, so you want to talk shit?" Just as A.N. signaled for T.T. to back up, another Asian American man swung at A.N. but missed, while a third Asian American man from Tran's group landed a punch in A.N.'s ribs. A.N. then countered by punching the third man in the face, which dislocated one of A.N.'s fingers.

While A.N. tried to defend himself from attacks, M.C.'s interceding efforts were similarly thwarted once three Asian American men wearing dark colors suddenly started "punching and kicking" him. While standing, M.C. raised his arms to defend himself from the blows. M.C. did not fight with any other individuals. His three attackers collectively pushed M.C. to the ground, toward the back end of a car.

After this first fall to the ground, M.C. was able to stand up "for a second." But almost immediately after M.C. stood up, he ended up back on the ground again. Tran, who was standing by M.C.'s side, flipped M.C. over, causing his head to be slammed into the hard concrete of Fourth Avenue. S.M., the General Manager of the La Puerta Bar, had a "clear shot" of the moment, witnessing a "shorter, stocky Asian male" perpetrator[3]– with a "fuller" face and "spikey" hair, standing five feet eight inches "if that" and 160

---

[3] S.M. was unable to identify Tran as the perpetrator. Over a month after the crime was committed, S.M. picked another man (not Tran) out of a photograph lineup of six men as the perpetrator. However, the person in the photograph that S.M. selected was not at the scene of the crime. At trial, S.M. testified that he had "no doubt" that the person depicted in the Snapchat video seen punching M.C. was the "short, stocky guy" that S.M. identified as the perpetrator.

pounds[4]—picking up the victim, flipping him, and then "body-slamm[ing] him, with the victim's head and the back of the neck hitting the ground, and then he landed his weight on him and threw a couple of punches." Tran straddled—"almost like sitting on"—M.C. as he repeatedly punched the victim in the face. A bystander's Snapchat[5] video depicted Tran punching M.C.'s paralyzed body at least five times. And Tran could not be excluded as a major contributor to the mixture of DNA found on M.C.'s shirt as well as the bottom of his shoe. Immediately after Tran punched M.C., Tran's girlfriend K.B. then approached "and threw a couple of punches" at M.C.'s head as well. S.M. described K.B.'s punch as a "haymaker," meaning a very violent punch with the intent to knock someone out. S.M. was unsure, however, whether K.B. actually landed a punch. Tran did not stop punching M.C. until D.M. approached and pulled him off of the victim. About the same time, Tran's brother T.T. pulled K.B. away from M.C. and gestured that they should all leave. Tran and his group abandoned M.C. and walked to the nearby sidewalk where Tran took off his shirt and wiped his face.

After he removed his button-down shirt, Tran was still wearing an undershirt. Neither Tran nor K.B. appeared to be significantly injured. Tran and his group then returned to the Hard Rock Hotel, where they were staying that evening.

---

[4]    According to Tran's 2015 DMV information, he was five feet five inches tall and weighed 152 pounds. However, at trial, a witness claimed Tran "appeared to be a little bit heavier in the surveillance videos" and his face "was a bit fuller" in comparison to his DMV photograph.

[5]    "Snapchat is a smartphone application that allows users to send pictures and videos (not to exceed 10 seconds in length) to friends or followers." (*In re M.H.* (2016) 1 Cal.App.5th 699, 704.)

When A.N. returned to M.C., he found M.C. lying motionless in the middle of Fourth Avenue. From that point on, M.C. was unable to move any part of his body below his neck; as he stated at trial, "[i]mmediately after I hit the ground, I just felt everything shut down." Z.T., a Gaslamp Café employee, and S.M. both separately called 911 after witnessing M.C.'s injury.

With the aid of other bystanders, A.N. helped move M.C.'s body from the middle of the street to the sidewalk and remained with him until an ambulance arrived. Paramedics transported M.C. to the UC San Diego Hospital, where he underwent multiple surgeries after sustaining a severely crushed spinal cord and several broken neck bones.

Neither the victim nor any of the eyewitnesses at trial positively identified Tran— or anyone else—as the one who slammed M.C. onto the ground and caused his paralysis. While at least one video captured M.C. and another person falling to the ground at high velocity behind a car, no camera was positioned to capture Tran flipping M.C. over or otherwise knocking M.C. down on his head.

At trial, an orthopedic spine surgeon explained that M.C. received "devastating vertebral column or spine injuries to the bones." He testified that such injuries required "a very large velocity and force" that typically involves spinal bone fractures and retropulsion into the spinal cord. He agreed that M.C.'s injuries were consistent with someone being thrown or dropped on their head. At the time of trial, M.C. remained a quadriplegic, paralyzed from his shoulders down.

DISCUSSION

I

THE VIDEOS OF THE INCIDENT

A.  Tran's Contentions

Tran asserts that the trial court erroneously admitted a "doctored" video[6] that was "compiled by" the prosecution's expert witness Grant Fredericks.  As a threshold matter, we observe the use of the term "doctored" connotes that Fredericks somehow manipulated or falsified the video.[7]  Tran provides absolutely no evidence whatsoever to support such a serious allegation.  In the absence of any evidence to support a claim that the other side fabricated evidence, a party or his or her attorney would be wise to avoid such inflammatory accusations.

If we look past Tran's hyperbole, it appears Tran challenges Fredericks's testimony about the videos after he enhanced them, arguing Fredericks "became the [fact finder] who decided and shaped the facts of the case instead of the jury."  Specifically, Tran argues the videos were improperly enhanced by Fredericks when he adjusted the height and width ratio on a video, synchronized multiple videos, corrected the blurring of a video, and used color coded arrows to identify certain individuals on the videos,

6      Although Tran refers to a single video, there were multiple videos admitted into evidence at trial.  Tran does not describe or distinguish the multiple videos in much detail.  Nevertheless, all the videos are in the record, and we will evaluate Tran's challenges to all of them.

7      Oxford's online dictionary defines "doctored" as:  "change the content or appearance of (a document or picture) in order to deceive; falsify."  (Oxford dictionary <https://www.lexico.com/en/definition/doctor> [as of June 8, 2020] archived at archived at <V4CB-E4QD>.)

including Tran. Tran then baldly asserts these enhancements resulted in Fredericks invading the province of the jury by making key factual determinations.

However, Tran's argument that Fredericks usurped the jury's role is undermined by later portions of his own brief. For example, Tran admits Fredericks testified that when and where he could not definitively identify a person in the video, he did not identify that person with a colored arrow. As Tran notes and one of the videos shows, at the time when the victim was slammed to the ground head first, there is no color coded arrow indicating Tran was near the victim at that time. Further, Tran emphasizes that there are 2.7 seconds of the video near when the victim is injured where there is no indication that Tran is in the video. Based on these alleged shortcomings in that video, Tran insists: "If Mr. Tran does not appear in any video causing or initiating [the victim's] injury-causing fall to the ground and if Mr. Tran does not also appear on the video(s) showing the victim on the ground immediately after the injury-causing fall, then it is quite difficult to convict him of Counts one and two."

Thus, Tran's complaint regarding the videos and Fredericks's testimony appears to be that the videos and testimony are not sufficient to convict him on either count. In other words, the videos are not substantial evidence to support his convictions. Beyond challenging the admissibility of the videos, Tran does argue that substantial evidence does not support his convictions, which we address in part II *post*. However, to the extent that he is arguing that Fredericks's testimony about the videos someone improperly made Fredericks the fact finder at trial in place of the jury, we struggle to find any support in the record for that argument. Tran admits that the videos do not show him

8

body slamming the victim. Fredericks testified at trial that he could not identify Tran in the video at the time the victim was body slammed; so, there is no color coded arrow pointing to Tran in the video at that time. Also, Tran does not point to anywhere in Fredericks's testimony where Fredericks opined that it was Tran who body slammed the victim or otherwise paralyzed him. As such, we reject Tran's contention that the admission of the video somehow transformed Fredericks into the ultimate fact finder at trial.

In almost a throw away fashion, Tran claims the "forensic video enhancement is not universally accepted and the law is not clear." He then implies that the enhancement techniques should be evaluated under the *Kelley-Frye* test.[8] However, Tran does not discuss the *Kelley-Frye* test or even argue that the video enhancement here does not qualify for admission under the *Kelley-Frye* test. Because he failed to provide any authority or cite to any portion of the record to support his position regarding *Kelley-Frye*, we conclude Tran has waived any such argument here. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Although we find Tran's challenges to the videos wanting, as the People note, there is no published California case addressing the admissibility of videos like those admitted at trial below. In addition, Tran's briefing on this issue did not provide any necessary background to describe the careful and thoughtful approach of the trial court in

---

[8]     The *Kelly-Frye* test is derived from two cases: *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014 (*Frye*).

admitting the videos and Fredericks's detailed testimony about the videos.  In contrast, the People describe with great specificity the steps taken by the trial court and Fredericks below.  Because of the novelty and importance of this issue, we will address the court's admission of the videos and Fredericks's related testimony.

### B.  Background

Video surveillance from nearby businesses and bystanders' cell phone videos captured the melee from multiple angles.  To help analyze and sequence these videos, the prosecution sought to call certified forensic video analyst Fredericks as an expert witness and admit his demonstrative work.

The prosecution filed a pleading entitled "People's Trial Brief and Motions In Limine" that included a motion to admit Fredericks's expert testimony regarding "forensic analysis of surveillance videos."  The motion noted that Fredericks would "clarify" the footage, explain "how he was able to assemble the multiple videos into a chronological sequence," and demonstrate "how he was able to track various individuals as they move across each of the videos."  In response, Tran's trial counsel opposed the prosecution's motion "to admit purported expert and lay testimony about the contents of video that the jury can see for itself," as well as the prosecution's "effort to introduce substantively altered video that merely reflects law enforcement's inadmissible opinions."

At the Evidence Code section 402 hearing, Fredericks laid out his qualifications, including summarizing his 30 years of experience as a certified forensic video analyst. Fredericks obtained a degree in television broadcast communications with an emphasis on television engineering from Gonzaga University.  He worked as a television news

10

reporter and producer for five years before joining the Vancouver Police Department, where he eventually headed the department's Forensic Video Unit. Since 1991, he has continually served as a forensic video analyst for Forensic Video Solutions. As the principal instructor for the Law Enforcement and Emergency Services Video Association (LEVA), he also has trained video analysts throughout the world. Since 2002, he has served as an instructor at the FBI National Academy, where he teaches four national academy sessions each year. In 2012, he became certified in the area of forensic video analysis by LEVA. Although he has a law enforcement background, his work as an expert witness has been evenly split between working for the prosecution and the defense.

After discussing his background, Fredericks explained how he generally processes videos for criminal investigations. First, he is proficient in performing video synchronization, image comparison investigations, aspect ratio calibration, color correction, motion tracking, and image authentication. Therefore, he focuses on preserving the integrity of a video. Because digital videos employ varying levels of image refresh rates, prediction levels, and frame rates to compress the size of videos, Fredericks tries to ensure that the resulting variances do not get misinterpreted by the viewer. He employs a variety of tools to "interrogate" each video file and analyze compression levels, frame rates, and pixel matrixes. Among other tools, he utilizes iNPUT-ACE, a software program that allows forensic investigators to process, enhance, and analyze videos, including movement management. Fredericks testified that the

11

procedures he described are "currently [used by] several hundred certified analysts and technicians, all of whom have been trained in this process."

Fredericks next detailed the work he did in this case. He spent "many dozens of hours" reviewing surveillance videos from the Hard Rock Hotel, the Las Hadas restaurant, Pacifica Hotel, Sultan Shawarma, and the Reef Bar. He also reviewed a cell phone video that had been filmed and uploaded to Snapchat. He then used slides 24 through 27 and 34 through 36 of the "Camera Perspective" PDF document, which is part of the record before us, to visually display how he determined the location and position of each camera, the area depicted in the footage, and the overlap between the footage. Fredericks explained in great detail how he synchronized the videos to create chronological sequences by, for example, using a person's leg movement in multiple videos to test synchronicity.

Fredericks's synchronized chronological sequences allowed him to track specific individuals moving across videos through color-coded arrows. By synchronizing minute details like clothing patterns and the location of one's feet, Fredericks was able to track an individual through multiple videos, even though that individual's image might have otherwise been too blurry to identify any person when simply viewing a specific moment of one video. For example, he explained how he was able to synchronize and track one individual (later identified as D.M.) across multiple videos:

> "The individual with the pink arrow that I'm tracking moves toward the activity on the ground. And . . . he then turns to his right, and we can see that same activity in the Las Hadas Video. . . .

"So the feet in the Las Hadas video turns to the right and moves in just as the individual that I have been tracking in the pink arrow turns to the right and moves in and down at the same time as in the Reef Bar video. We see now the full upper body and face of the individual I was tracking. His face is reflected. He is obviously a light-skinned male reflected in the light. And he bends down and over. He is the only person doing this. That's reflected in the Snapchat video and the Reef Bar video. And he bends down. He then pulls back up.

"So if I go backwards and forward and move my arrows to do that, up, he goes backwards and now down. So we can track his movement. We now know without a doubt, we are tracking the right person."

Fredericks testified that he only assigned a color arrow to an individual when he could validate its accuracy with forensic certainty. He acknowledged that "where I have assigned an arrow, my opinion is it is the same person." Consequently, there are several moments in a video when Tran or others in his group may appear in the video, but Fredericks did not include a corresponding arrow because the person was too far away from the camera or Fredericks could not be certain that the shoes appearing on the street, for example, belonged to a specific individual.

Fredericks explained that all of his work and conclusions are documented in a way that another person with similar training and experience could review Fredericks's work and identify areas where he or she disagreed with any of his conclusions. Specifically, he noted that with regard to "all of my work product and all of the placement, there is a record within Photoshop of every position of every hour for every image, and that's locked into Photoshop," allowing peer review. Fredericks also explained that all his work

13

is "technically peer reviewed before it goes out." While the peer review is handled "internally," some of his work "gets externally peer reviewed."

Fredericks acknowledged the limits of his expertise and how he would not opine in various areas that might infringe on the province of the jury. For example, he noted that he would not be testifying to whether the video shows one person making contact with another. He explained:

> "My general practice in force issues is to describe the X/Y coordinate of a motion perhaps or these pixels that I would describe represent the arm of this clothing, and I can track that motion from this area to this area.
>
> "I'm not a use-of-force expert. I am not going to tell the jury, 'here, you should see this person kicking this person and this person punching that person.' That's not what I am going to do."

Specifically, Fredericks stated that he "wouldn't be offering any opinion, statement, comment about the nature of [M.C.'s] fall and what injuries were caused" or "who caused the motion to the ground." Fredericks then explained why his expertise was necessary to assist the jury, and how and why the average person who separately views multiple videos may not appreciate how and when they capture the same scene at the same time. First, he noted that most laypeople struggle to process how one object or person in a video is the same object or person in another video. Because of cameras positioned on different sides and points of the street, "you have individuals not just moving left to right, moving at the Z axis . . . , which is away from the camera in one view, but left to right on another view."

14

Additionally, Fredericks explained that people have difficulty understanding the significance of blurring in a video, which could represent fast motion. According to Fredericks, jurors also might fail to appreciate how infrared impacts various colors—and more specifically, the colors of a person's clothing—causing a person to appear to be wearing different clothing in different videos of the same event. Fredericks disputed the notion that he "altered" the videos, emphasizing that "the meaning of all the videos are maintained." While he acknowledged adding the movement-tracking arrows, he stressed that the "actual images are completely untouched." He also pointed out that he used a cubic interpolation process to calibrate the Las Hadas video to the correct aspect ratio. However, for all other videos, "the tonal values of every single pixel are maintained."

After hearing Fredericks's testimony at the Evidence Code section 402 hearing, the trial court allowed Fredericks to testify at trial and admitted his "color-tracking" videos into evidence. The court concluded: "It is clear to me that the testimony of the witness would assist the trier of fact, and that not only would it assist the trier of fact, I think it is quite necessary to assist the trier of fact." The court further determined that Fredericks's testimony "is related to a subject that is sufficiently beyond common experience." Given that the videos were "busy, full of commotion, hard to follow, active, and even with the benefit of the colored indicators, . . . are very difficult to track," the court found that tracking them without Fredericks's assistance would be "impossible . . . and even with his assistance, very difficult."

The trial court ruled that there was no need to apply the *Kelly-Frye* test, noting that "the methods and procedures described by the expert are not a novel, scientific testing

15

method or procedure." The court observed the Ninth Circuit's opinion in *United States v. Cairns* (1970) 434 F.2d 643, 644 (*Cairns*), which allowed an FBI photographic identification specialist to testify that the bank robber in a bank's surveillance camera photograph was the same person in a police photograph (of defendant), after enlarging the head area of the bank photo and comparing the similarities in facial characteristics, hairlines, chin lines, and ear contours. The trial court noted that *Cairns* demonstrated "how long photographic comparisons have been done." Additionally, the court found that Fredericks's process of "synchronization, which is really the heart of the value . . . that the witness provides, uses no special method" and rests on common sense. Also, the court observed that it believed Tran's trial counsel's cross-examination of Fredericks "was very effective" and commented that "the jurors are going to very easily not be blinded by any of the science. There really isn't science to this."

After weighing the various Evidence Code section 352 factors, the trial court then found no prejudice and further concluded that any prejudice was outweighed by the probative value under the facts and circumstances of this case.[9] Dismissing concerns that Fredericks's testimony or the videos might be based on unreliable or speculative techniques, the court noted the minimal risk "that the jurors are going to be blinded by [the expert's] magic and accept a conclusion without any independent analysis." Because Fredericks's work is "transparent" and subject to replication, the trial court noted that the

---

[9] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

jury "can track what it is that the witness relied upon" and "make independent determinations as to the reliability."

At trial, after summarizing his credentials, Fredericks explained to the jury that "most of what a video analyst does is ensure that the evidence can be played accurately, and that any errors that might be in the images can be explained and that objects can be tracked." He stated that "tracking comparison work" is very common and the most common request he receives. Another "very common request" is synchronizing videos from multiple sources, which he has done "thousands of times." He also told the jury that his work in criminal cases is nearly "50/50" between working with prosecutors and working with the defense.

Fredericks next discussed his work in the instant matter, detailing which videos he received, and their differences in quality. He used annotated maps of the surrounding area to show the jury the location and angles of each camera that provided footage. He also explained any corrections or calibrations he made to account for infrared cameras or distorted aspect ratios. He then synchronized these videos, and "put them in a format that would allow them to be understood in court and to assist in tracking the movements of a number of individuals who appear in a large number of cameras, and then to determine the relationship, how the individuals interact together, and how then to produce demonstratives that demonstrate that process."

He then described how he tracked individuals. Specifically, when tracking Tran,[10] he noted how Tran differed in appearance from the others in his group. Fredericks testified that Tran wore "pointed dress shoes," "a dark crewneck t-shirt," and "a dark dress shirt" that he later removed and eventually rolled up; he had short, shaved hair on the side of his head; and he was often "arm in arm" with the woman underneath the green arrow." Unlike D.X., Tran was not wearing a red hat, he did not have visible arm tattoos, and he was not wearing casual shoes with white tips and white shoelaces. Unlike K.N., he was not wearing a pink shirt. Unlike his brother T.T., he was not wearing a white shirt, a white cap, and white pants Unlike his brother D.T., Tran did not wear glasses. Fredericks also explained that he tracked individuals who were not part of Tran's group. The victim, M.C., was tracked with a yellow arrow. M.C.'s friend A.N. was tracked with a purple or fuchsia arrow. D.M. was tracked with a pink arrow. Finally, M.M., the bystander who filmed the fight through the Snapchat app on his phone, was tracked with a peach arrow.

Most significantly, Fredericks opined that M.C. and just one other individual moved to the ground between frames 50999 and 51114, which immediately preceded the moment in which M.C. became immobilized. As Fredericks slowly advanced and "rewinded" these moments for the jury, he noted that the video shows "the movement on the ground of two individuals." He further explained that 2.7 seconds separated the point

_____

10    Although Fredericks never identified any of the individuals in the videos by name, it was understood that Tran was indicated in the videos by a blue arrow. Indeed, Tran's own trial counsel referred to Tran as the blue arrow individual.

18

in which M.C. first goes to the ground in the Reef Bar video and the moment in which the action "is picked up on the other side by the Snapchat video." He noted that "nobody goes to those two individuals at this point until [after] we see the movement on the Snapchat video" when "the green arrow female" (K.B.) and the "red male dressed all in white" (T.T.) move toward M.C. Fredericks also observed that "nobody moves away from that area" during this critical portion of the video. While the videos depicted other individuals who stood watching and filming the fight, Fredericks observed that there was "still quite some distance between any of the individuals" and M.C.

In the footage before M.C. hit the ground the second time, Fredericks explained that he placed no blue (or any color) arrow above the individual who hit the ground with M.C. because he could not track that person in those frames with forensic certainty. Fredericks stated that he did not use an arrow in those circumstances where he lost continuity or the individual was too far away or lost in a group. However, Fredericks cautioned that the lack of an arrow "doesn't mean the person is not there," but rather, "just means that I can't prove to a certainty that that is the person."

Fredericks showed that the blue arrow appears again around frame 51304 because the Snapchat video captured Tran's pointed dress shoe, his long, dark pants, and his long-sleeved dark shirt with cuffs, as he repeatedly punched M.C. Moreover, when D.M. appeared in the video and pulled Tran off M.C., the video, around frame 51333, provided a clear view of Tran's tightly cropped or shaved hair on the sides of his head. Fredericks further noted that "nobody ha[d] that specific ensemble characteristics that I can see" in the videos. Additionally, other videos tracked Tran moving off with his group as they

19

returned to the Hard Rock Hotel, where cameras depicted him carrying his dress shirt in his right hand.

## C.  The Law

The trial court is empowered with broad discretion to determine the relevance of evidence, including questions regarding its probative value and undue prejudice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 (*Rodriguez*).)  This broad discretion applies to the determination of the relevancy of expert evidence as well.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)

Given the broad discretion accorded to trial courts to determine the relevancy of evidence, trial judges bear a substantial gatekeeping responsibility to ensure the proper use of expert testimony.  (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772-773.)  "[U]nder Evidence Code sections 801, subdivision (b) and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative."  (*Id.* at pp. 771-772; see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371; Evid. Code, §§ 801-802.)

Evidence Code section 801 provides:

> "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

20

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Whether a person qualifies as an expert upon a particular subject depends upon the facts of that case and the witness's qualifications. (*People v. Davis* (1965) 62 Cal.2d 791, 801.) "The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (*People v. King* (1968) 266 Cal.App.2d 437, 445.)

" 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426, quoting *People v. Watson* (2008) 43 Cal.4th 652, 692; Evid. Code, § 801, subd. (a).) The pertinent question in allowing expert testimony and expert opinion is whether, even if the jurors have some knowledge of the subject matter, the testimony would assist them. (*People v. Lindberg* (2008) 45 Cal.4th 1, 45 (*Lindberg*); accord, *People v. Prince* (2007) 40 Cal.4th 1179, 1222.)

Although the trial court concluded that the *Kelly-Frye* test did not need to be applied to the admission of the videos, and we found that Tran waived any challenge that such a determination was error, we believe it prudent to briefly describe the subject test to provide necessary context to our analysis. The *Kelly-Frye* test consists of three prongs

21

and was adopted by the California Supreme Court to analyze the reliability of expert testimony based on new or novel scientific methods or techniques. (See *People v. Lucas* (2014) 60 Cal.4th 153, 223.) The rule "governs the admissibility of evidence derived from new scientific techniques." (*People v. Jones* (2013) 57 Cal.4th 899, 936.) The rule applies only " 'to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' [Citation.]" (*People v. Leahy* (1994) 8 Cal.4th 587, 605.)

The purpose underlying the rule is to protect a jury from expert testimony that conveys a " 'misleading aura of certainty' " about a scientific technique. (*Kelly*, *supra*, 17 Cal.3d at pp. 30-32; see *People v. Stoll* (1989) 49 Cal.3d 1136, 1155.) The *Kelly* analysis thus is designed to address "scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas* (1998) 18 Cal.4th 47, 80.)

Under the *Kelly-Frye* test, "the proponent of evidence derived from a new scientific technique must establish that (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used." (*People v. Doolin* (2009) 45 Cal.4th 390, 445.) "Whether a new scientific technique has gained general acceptance is a mixed question of law and fact." (*Id.* at p. 447.) However, "proof of such acceptance is not necessary if a published appellate opinion affirms a trial court ruling admitting evidence obtained through use of

that technique, at least until new evidence is admitted showing the scientific community has changed its attitude." (*People v. Cordova* (2015) 62 Cal.4th 104, 127.)

The trial court's discretion to admit any demonstrative evidence is reviewed for abuse of discretion. (See *People v. Caro* (2019) 7 Cal.5th 463, 508.) In *People v. Duenas* (2012) 55 Cal.4th 1 (*Duenas*), the California Supreme Court explained that the admissibility of any evidence altered, generated, or otherwise analyzed by computer software depends on whether such evidence constitutes a "computer animation" or a "computer simulation." (*Id.* at pp. 20-21.) The court explained the difference between the two:

> " 'Animation is merely used to illustrate an expert's testimony while simulations contain scientific or physical principles requiring validation. [Citation.] Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids. [Citation.] Computer simulations are created by entering data into computer models which analyze the data and reach a conclusion.' [Citations.] In other words, a computer animation is demonstrative evidence offered to help a jury understand expert testimony or other substantive evidence . . . ; a computer simulation, by contrast, is itself substantive evidence." (*Id.* at p. 20, citations omitted.)

The court determined that a computer animation is admissible if " ' "it is a fair and accurate representation of the evidence to which it relates. . . ." ' " (*Ibid.*) In contrast, a computer simulation is only admissible if it complies with the *Kelly-Frye* test. (*Duenas*, at pp. 20-21.)

## D. Analysis

As a threshold matter, we agree with the trial court that neither Fredericks's testimony nor the videos were subject to the *Kelly-Frye* test. Like the animated video in

23

*Duenas*, Fredericks's work is a form of computer animation analogous to "charts or diagrams" used in other "classic forms of demonstrative evidence." (*Duenas*, *supra*, 55 Cal.4th at p. 20.) Fredericks did not alter the underlying surveillance videos, except to enhance their quality and correct pixel ratios. In fact, he aimed to preserve the integrity of the videos. In addition, Fredericks testified that his technique for tracking and sequencing videos involved both common sense and longstanding tools routinely used for image comparison. Tran does not point to any contrary testimony in the record. Tran did not call an expert witness to contradict Fredericks's testimony about the techniques that he was using. And we have found nothing in the record that Fredericks was using new or novel techniques to enhance the videos.

Also, unlike computer simulations created by reconstruction experts, the videos admitted at trial in the instant action were not speculative or imaginative creations that purported to show what Fredericks (or anyone else) believed might have happened at the time in question. Rather, Fredericks's expertise was provided as an aid to help others understand the raw surveillance footage, which the jury was also provided. Moreover, Fredericks's tracking arrow videos resembled surveillance videos that are routinely modified so that a specific area of the screen is circled or brightened (or the rest of the video is darkened) to draw the viewer's attention to a specific area. These arrows essentially functioned like a witness writing an X on a map or placing a Post-It note with a name on an enlarged photograph. Indeed, if one of Tran's friends had testified and identified individuals in the surveillance videos, such testimony would have been unremarkable, though the effect would have been no different than Fredericks's testimony

24

and demonstrative evidence (the videos). While that hypothetical witness's ability to identify people would stem from knowing them personally and having been present at the scene, Fredericks's ability to identify individuals in the videos stems from his study of the videos as well as his own awareness of each person's physical characteristics on the night in question. Put differently, the colored arrows identifying individuals that Fredericks added to the videos were not the product of some new scientific technique that he developed for the instant matter. Instead, they were based on Fredericks's observations and were intended to help the jury. The jury was free to disregard the arrows if the arrows did not comport with the jury's viewing of the videos. Simply put, because Fredericks's videos did not constitute or seek to replace substantive evidence, there was no need to apply the *Kelly-Frye* test. (See *Duenas*, *supra*, 55 Cal.4th at p. 20.)

Because we agree with the trial court that the *Kelly-Fyre* test did not apply to the admission of the videos, we turn to whether the court abused its discretion in admitting the subject evidence. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1057.)

Based on the record before us, we conclude that the trial court did not abuse its discretion in admitting the videos or Fredericks's testimony about the videos. The challenged evidence was relevant, useful, and highly probative of the circumstances that led to M.C.'s paralysis. Fredericks's testimony helped the jury to identify what portions of the video evidence required closer examination and to interpret some of the information conveyed by the video evidence. His expertise was necessary for the jury to accurately evaluate the videos to appreciate who and what they were watching as well as the chronology and relationship between each video. As the trial court noted, the

25

individuals in the videos were very difficult to track "even with the benefit of [Fredericks's] colored indicators," and "impossible" to track without his expert assistance.

Although jurors ordinarily may be capable of watching a surveillance video and understanding what they see without expert help, the scene captured by the multiple videos was especially challenging. As such, Fredericks's assistance in this case was critical because multiple surveillance videos depicted a moving melee, at night, with at least a dozen bodies interacting on a crowded street. Fredericks's testimony and sequenced videos were necessary to aid the jury's understanding of how the different videos captured the same action from different angles, thus minimizing confusion that can result from contrasting video perspectives, contradictory descriptions, or unreliable eyewitnesses. Indeed, Fredericks's synchronization demonstratives and tracking videos were critical for the jury to make sense of the various videos that differed by way of time stamps, camera angles, dimensions, lighting, resolution, pixel ratios, and quality. Further, as the crime occurred at night and the lighting of the streets and in the videos was not uniform, Fredericks's testimony and enhancement of the videos aided the jury in identifying the various participants in the melee. Of course, if a juror did not agree with Fredericks's identification of an individual in a video, he or she was free to disregard it. In fact, the trial court jury instructions buttressed this point as the court informed the jury that it could disregard Fredericks's opinion and testimony:

> "Witnesses allowed to testify as experts and to give opinions. . . . You must consider the opinions, but you are not required to accept them as true or correct. . . . The meaning and importance of any opinion are for you to decide.

26

"In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.

"In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.

"You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.

"It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

Further, the court also instructed the jury that it was the ultimate finder of fact, not Fredericks: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened[.]"

Additionally, Evidence Code section 352 does not change our conclusion. The highly probative value of Fredericks's videos was not substantially outweighed by the danger of unfair prejudice. While Fredericks's work may have involved sophisticated software, technical jargon, and years of experience, there was no risk that the jurors would be left confused or misled. There was nothing sensational about his testimony or videos. Fredericks's testimony and enhancement of the videos simply helped the jury observe what the videos showed. The jurors could easily appreciate that Fredericks clarified some videos, sequenced and combined videos so that the jury could watch the

27

same events (at the same time from different angles) on one screen, and tracked various individuals.  There was nothing improper about the admission of the videos or Fredericks's testimony.  (Cf. *People v. Perry* (1976) 60 Cal.App.3d 608, 615 [in allowing a police officer to identify the perpetrator in blurry surveillance footage, the court noted "[t]he testimony d[id] not invade the province of the trier of fact, but rather [wa]s submitted as an aid in the determination of the ultimate question of the identity of the culprit and the defendant's guilt or innocence"].)

Although there is no published California case addressing the admissibility of videos that were enhanced as in the instant matter, we observe that our conclusion that the court did not abuse its discretion in admitting the videos at trial is consistent with how other jurisdictions have dealt with similar situations.  (See, e.g., *State v. Almaraz* (2013) 154 Idaho 584, 603 [forensic video analyst Grant Fredericks properly qualified to opine about, and assist the jury to determine, which frame depicted the victim reacting to being shot]; *Stevenson v. State* (Tex.Ct.App. 2010) 304 S.W.3d 603, 623 [forensic video analyst Grant Fredericks's testimony admissible to help the jury clarify the images obtained from a poor-quality, black-and-white video]; see *United States v. Alexander* (5th Cir. 1987) 816 F.2d 164, 167 [holding that the trial court should have allowed bank robbery defendant to present expert testimony challenging the government's assertion that defendant was the one depicted in surveillance photographs of the robbery]; *United States v. Sellers* (4th Cir. 1977) 566 F.2d 884, 886 [expert's testimony admissible to explain the effects of light, shadow, reflections, distortion from perspective, and other technical factors on surveillance photograph]; *Cairns*, *supra*, 434 F.2d at p. 644

28

[photographic identification specialist's testimony permitted to testify to similarities between enlarged surveillance photograph and police photograph].)  Also, our high court has "decline[d] to require a greater showing of authentication for the admissibility of digital images merely because in theory they can be manipulated."  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 272, citing *Owens v. State* (2005) 363 Ark. 413, 420 [214 S.W.3d 849], 854 [refusal to impose a higher burden of proof for admissibility of still photographs taken from a store surveillance camera's videotape merely because digital images are easier to manipulate].)

Accordingly, we are satisfied that the trial court did not abuse its discretion in admitting the videos and Fredericks's testimony at trial.

II

SUFFICIENCY OF THE EVIDENCE

A.  Tran's Contentions

Tran maintains the evidence was insufficient for the jury to convict him of assault by means likely to produce great bodily injury and/or mayhem.  We disagree.

B.  Standard of Review

We review a sufficiency of the evidence claim under the familiar and deferential substantial evidence standard of review.  (See *People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)  Substantial evidence is evidence that is "reasonable, credible, and of solid value."  (*Rodriguez*, *supra*, 20 Cal.4th at p. 11.)  In reviewing for substantial evidence, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (See *People v. Lee* (2011) 51 Cal.4th 620, 632.)

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins and ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.) Whether the evidence presented at trial is direct or circumstantial, the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 92.) Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. (See *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1356.)

30

## C. Analysis

The parties do not dispute the elements of the two offenses the jury convicted Tran of. At trial in the instant action, the court instructed the jury that to prove that Tran was guilty of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), the prosecution had to prove that: (1) The defendant did an act that by its nature would directly and probably result in the application of force to a person; (2) the force used was likely to produce great bodily injury; (3) the defendant did that act willfully; (4) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; (5) when the defendant acted, he had the present ability to apply force likely to produce great bodily injury to a person; and (6) the defendant did not act in self-defense or in defense of someone else. (See CALCRIM No. 875.)

To conclude that Tran personally inflicted great bodily injury that caused M.C. to become paralyzed within the meaning of section 12022.7, subdivision (b), the jury had to find the prosecution proved: (1) the defendant personally inflicted great bodily injury on M.C. during the commission of the crime; and (2) the defendant's acts caused [M.C.] to suffer permanent paralysis. (See CALCRIM No. 3161.)

Regarding the crime of mayhem, section 203 defines simple mayhem as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." As the jury here was instructed, the prosecution had to prove that Tran unlawfully and maliciously disabled or

31

made useless a part of someone's body and the disability was more than slight or temporary, and the defendant was not acting in self-defense. (See CALCRIM No. 801.)

In the instant action, Tran claims the prosecution did not present any evidence that he committed an act of force on the victim that could have possibly caused serious bodily injury such as paralysis. To this end, Tran focuses on the fact that there is no video depicting him slamming the victim to the ground on his head. He also points out that the eye witnesses to the brawl offered differing testimony and did not testify that they saw Tran commit any act that would have seriously harmed the victim (like causing paralysis). However, in making these arguments, we note that Tran all but ignores the substantial evidence standard. Although he points out all the evidence that he believes is insufficient, he fails to appreciate that, in a substantial evidence review, we must review " 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 681, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) When we apply the proper standard of review to the whole record, we conclude that substantial evidence supports Tran's convictions.

S.M. testified that the person who threw the victim down on his head was the same person who then began punching the victim's face immediately afterwards. The original Snapchat video taken at the scene captured Tran straddling M.C. and punching his immobile body in the face, without any other individuals standing immediately nearby.

32

(See People's Exhibit No. 11.)  Indeed, Tran does not dispute that he was the one who repeatedly punched M.C. several seconds after the act that caused the permanent paralysis.  Nor does he contend that he was acting in self-defense.

Although S.M. incorrectly identified someone else (who was not at the scene of the crime) in a photographic lineup as the "closest" to who he observed on the night in question and described the perpetrator as someone with a different colored undershirt, the jury nonetheless determined that S.M. was credible when he testified about how the person who body slammed the victim was the same person who was repeatedly punching the victim's face seconds later.  Because S.M.'s testimony was not "physically impossible or inherently improbable," we are not free to disregard the jury's implicit finding that S.M.'s testimony was believable.  (*People v. Elliot* (2012) 53 Cal.4th 535, 585.)  The jurors could disregard that portion of S.M.'s testimony that conflicted with its ultimate finding regarding Tran's guilt.  In fact, it seems logical the jury would believe a witness who observed a terrifying event:  a man slamming another man headfirst into the ground then pummeling the fallen man without mercy.

Additionally, we are not troubled by inconsistencies Tran points out in S.M.'s testimony.  Tran is merely arguing about the weight to give S.M.'s testimony and raising issues of credibility.  Both of those issues are for the jury to decide, not this court.  We do not reweigh evidence or reassess a witness's credibility and we presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*Lindberg*, *supra*, 45 Cal.4th at p. 27.)  Simply put, the jurors were free to disbelieve all of Tran's version of

33

events in favor of other conflicting evidence.  (See *People v. Silva* (2001) 25 Cal.4th 345, 369.)

Further, the video footage supports S.M.'s testimony that Tran was the perpetrator. Although S.M. misremembered details about Tran's appearance, his general description of the perpetrator as a "shorter, stocky Asian male" with a "fuller" face and "spikey" hair, with a height of, at most, five feet eight inches, and a weight of approximately 160 pounds accurately describes Tran.  Moreover, S.M.'s testimony of the perpetrator using a button-down shirt to wipe his face while wearing an undershirt were corroborated by video footage from the Hard Rock Hotel; while Tran wore a black—and not a white—undershirt, multiple cameras captured Tran walking with his button-down shirt in his hands and repeatedly holding it up to an apparent cut on his eye.

Also, surveillance videos reveal that only 2.7 seconds separated the moment that M.C. is slammed to the ground from the point that the Snapchat footage begins.  Yet, during that intervening period of time, no person is seen next to or moving toward or away from Tran, aside from multiple bystanders filming the fight with their cell phones. Thus, it is reasonable and logical for the jury to determine that the video footage supported S.M.'s testimony that Tran was the perpetrator.

Against this backdrop, we are satisfied that substantial evidence supports the jury's verdict at trial, specifically that Tran was the person who slammed the victim headfirst to the ground causing him to be paralyzed.

THE TESTIMONY OF MARCO PEREZ

Tran insists the trial court erred in admitting the opinion of Detective Marco Perez. Specifically, Tran claims the court abused its discretion in allowing Perez "to testify as to the factual and legal conclusions that he drew from his work with the videos acquired from the establishments in the Gaslamp district." However, Tran does not cite to any portion of Perez's trial testimony and explain why that specific portion of the testimony should not have been admitted. Instead, he cites to portions of Perez's testimony during the Evidence Code section 402 hearing, which occurred outside the presence of the jury and was not evidence considered by the jury in rendering its verdict.

Toward the end of that Evidence Code section 402 hearing, Tran's attorney argued that Perez's testimony constituted inadmissible expert testimony. The trial court disagreed, finding that Perez "has laid the foundation that he has spent well over 100 hours viewing the different videos," and "has prepared exhibits showing how he reached his conclusions, one showing the DMV and Facebook and the different videos, thus allowing the jurors to assess the validity of the reliability of this witness' opinion."

The court concluded that "it is entirely proper and appropriate and helpful, if not necessary, to the jury to have the testimony of the detective be able to opine who the individuals are, if he is able to, in different videos that are relevant to the facts the jury needs to find."

We assume that Tran takes issue with the court allowing Perez to testify at trial, not at the preliminary hearing. In their respondent's brief, the People point to some of

Perez's trial testimony in an attempt to ascertain what portions of Perez's testimony Tran finds improper. In his reply brief, Tran could have responded to the respondent's brief by citing to the portions of the record containing Perez's testimony and explaining why each specific portion was improperly admitted. But he did not do so. Instead, Tran merely provided us with a general argument. He confirmed that he was challenging "not only . . . Perez's testimony from the [Evidence Code section] 402 hearing, but also his identification of people in the surveillance videos at trial." However, he provided no citations to the record, leaving it for this court to scour the record to support his argument. That is not the domain of the appellate court.

An appellant has the burden to provide an adequate record and affirmatively show reversible error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) Further, it is the appellant's duty to support arguments in his or her briefs by references to the record on appeal, including citations to specific pages in the record. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) "Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]' " (*Nelson v. Avondale Homeowners Assn.*, *supra*, 172 Cal.App.4th at p. 862.) "We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived." (*In re Marriage of Falcone & Fyke*, *supra*, 164 Cal.App.4th at p. 830.)

Here, Tran has not provided any citation to the record to support his argument that Perez's testimony was improperly admitted. He does not specifically indicate any testimony or even point us to Perez's trial testimony whatsoever. As such, we consider his challenge to Perez's testimony waived. (See *Nelson v. Avondale Homeowners Assn.*, *supra*, 172 Cal.App.4th at p. 862; *In re Marriage of Falcone & Fyke*, *supra*, 164 Cal.App.4th at p. 830.)

IV

INEFFECTIVE ASSISTANCE OF COUNSEL

A. Tran's Contentions

Tran asserts that his trial counsel was prejudicially ineffective because he "did not present any defense or introduce any witnesses to contest the various versions of events." Tran also takes issue with the fact that his counsel did not call an expert witness at trial.

B. Analysis

To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) It is the defendant's burden to prove the inadequacy of trial counsel, and defendant's burden is difficult to satisfy on direct appeal. Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

37

The United States Supreme Court explained that "[j]udicial scrutiny of counsel's performance must be highly deferential [because i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689.) Thus, the court explained, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Ibid.*; see *People v. Lucas* (1995) 12 Cal.4th 415, 437 (*Lucas*), quoting *Strickland*, at p. 689 ["[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' "].) We reverse on the ground of inadequate assistance only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*Lucas*, at pp. 436-437.)

Here, the record does not provide us with sufficient information from which we could determine whether Tran met his burden to show ineffective assistance of counsel. Essentially, Tran insists that his trial counsel did not put on a defense whatsoever. Our review of the record does not support such a conclusion.

Tran's trial counsel cross-examined the prosecution's witnesses. For example, he pointed out several discrepancies in A.N.'s testimony, thus identifying reasons for the jury to find him not credible. Defense counsel also repeatedly challenged A.N.'s memory

38

and veracity by confronting him with his own contradictory testimony from the preliminary hearing.

Moreover, during his closing argument, defense counsel focused on A.N.'s and other witnesses' inconsistencies. Counsel began by emphasizing how the prosecution's "best witness, Mr. [S.M.] . . . didn't say that Mr. Tran slammed this person. In fact, he said somebody else did, based on the photo identification." Defense counsel specifically reminded the jury how A.N. previously testified that he punched an Asian man (who turned out to be Tran) when the brawl first started, but at trial, only admitted to evading and parrying others' punches. Counsel also stressed that one of the key witnesses, D.M., described the perpetrators as "two Hispanic males, either 6 feet tall or almost 6 feet tall, 190 to 200 pounds."

After summarizing these "conflicting testimonies," defense counsel then argued that the jury could not convict Tran by "just pick[ing] out a couple of things that happen to fit into the prosecutor's case and jettison[ing] the rest":

> "We have to evaluate how all the evidence fits together. But that's not the same thing as saying we can kind of cherry pick our way to a guilty verdict, meaning, you know, disregard that inconvenient thing about [R.R.]. Disregard [D.M.'s] final 18 seconds. Disregard the white shirt. Disregard all these other things. That's not the way this works."

The prosecutor apparently believed defense counsel's closing was effective because he responded directly to defense counsel's argument by noting that eyewitnesses to a chaotic brawl on a crowded street at 2:00 a.m. are inevitably going to falter in their recollections.

39

Although Tran's trial counsel might not have called any witnesses during Tran's case-in-chief or an expert witness to challenge the prosecution's expert, these strategic choices are not of the moment. Defense counsel's strategy was to argue the prosecution failed to prove its case. Generally, we defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *People v. Holt* (1997) 15 Cal.4th 619, 703; *Lucas*, *supra*, 12 Cal.4th at p. 437.) Here, without some indication in the record that this decision showed that defense's counsel's trial performance fell below the standard of reasonableness, we will defer to counsel's tactical decision in this case.[11] (See *Scott*, at p. 1212.)

An appellate court generally cannot fairly evaluate counsel's performance at trial based on a silent record. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) In many instances, like here, evaluation of a claim of ineffective assistance of counsel will have to await a petition for writ of habeas corpus, should the defendant believe there is a viable claim that can be pursued. (*Ibid.*)

---

[11]     Because Tran cannot show his trial counsel's representation at trial fell below an objectively reasonable standard, we need not evaluate his claim of prejudice.

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.